UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MASON TENDERS DISTRICT COUNCIL OF
GREATER NEW YORK, MASON TENDERS
DISTRICT COUNCIL WELFARE FUND,
PENSION FUND, ANNUITY FUND,
TRAINING FUND, HEALTH AND SAFETY
FUND, and JOHN J. VIRGA, *as funds' Director*,

                                    Plaintiffs,

                    -against-

PHASE CONSTRUCTION SERVICES, INC., SL
CONSTRUCTION GROUP, INC., SALVATORE
LABARCA, and PHASE NY, INC.,

                                    Defendants.

**OPINION AND ORDER**

14 Civ. 06016 (ER)

Ramos, D.J.:

A union,[1] five of its affiliated employee benefit funds,[2] and the funds' Director, John J.

Virga (collectively, "Plaintiffs"), bring this action against SL Construction Group, Inc. ("SL

Construction"), Phase Construction Services, Inc. ("Phase Construction"), Phase NY, Inc.

("Phase NY"), and their owner, Salvatore LaBarca ("LaBarca"), for violating the Employee

Retirement Income Security Act ("ERISA"), the Labor Management Relations Act ("LMRA"),

and the terms of the Collective Bargaining Agreement (the "CBA") between them.  The parties

cross move for summary judgment.  Plaintiffs also move for preclusion pursuant to Federal Rule

of Civil Procedure 37(b)(2)(A)(ii).  Doc. 134.  For the reasons set forth below, Plaintiffs' motion

---

[1] The Mason Tenders District Council of Greater New York (the "Union").

[2] The Mason Tenders District Council Welfare Fund ("Welfare Fund"), the Mason Tenders District Council Pension
Fund ("Pension Fund"), the Mason Tenders District Council Annuity Fund ("Annuity Fund"), and the Mason
Tenders District Council of New York Mason Tender Training Program Fund ("Training Fund" and together with
Welfare Funds, Pension Fund, and Annuity Fund, the "Funds").

for summary judgment is GRANTED in part, Plaintiffs' motion for preclusion is DENIED as moot, and Defendants' cross-motion for summary judgment is DENIED.

## I.      Background[3]

In March 2005, LaBarca formed SL Construction to provide construction services.  Doc. 141-13, 37–38.  Shortly thereafter, SL Construction and the Union entered into the CBA.  Doc. 141-5, 24.  By its terms, the CBA became effective on July 1, 2005, remained in effect through June 30, 2008, and renews from year to year thereafter until either party gives written notice of its desire to modify, amend, or terminate the agreement.  *Id.* at 23.  In addition to SL Construction, the CBA covers any other company "form[ed]" by SL Construction's "owner or principal" as long as that other company "perform[s] bargaining unit work within this jurisdiction," and holds SL Construction "and such other company . . . jointly and severally liable for each other's obligations under the Agreement."  *Id.* at 4.

The CBA requires SL Construction and other covered employers to make three types of payments:  (1) for all hours paid to Mason Tenders, Mason Tender Foremen, and Mason Tender Assistant Foremen, the covered employer must pay (a) $6.84 to the Welfare Fund, (b) $5.15 to the Pension Fund, (c) $5.00 to the Annuity Fund, and (d) $.50 to the Training Fund,[4] *id*; (2) from the hourly wages of Mason Tenders who authorized dues check offs, the covered employer must deduct $1.35 and "promptly pay over such sums to the Mason Tenders District Council not later

---

[3] The Court gathers these facts from the record and from Plaintiffs' Local Rule 56.1 Statement.  Defendants argue that the Court should strike Plaintiffs' Local Rule 56.1 Statement because it, allegedly, makes "purely conclusory" statements and contains "legal arguments."  Doc. 168, 10–11.  In its briefing, Defendants fail to point to a specific paragraph that includes these flaws and instead attack "the entirety of points F, G, and H."  *Id.*  The Court has reviewed the Plaintiffs' statement and finds that it complies with the Local Rule because it consists of concise statements, organized in numbered paragraphs, with citations to the record.

[4] The CBA does not reference the Mason Tenders District Council Health and Safety Fund.  Instead, it requires covered employers to pay the New York state Health and Safety Trust Fund.  Doc. 141-5, 13.

than one week after said deduction," *id.* at 12; and (3) from the hourly wages of the Mason

Tenders who authorized contributions to the Mason Tenders District Council Political Action

Committee ('MTDCPAC'), the covered employer must deduct $.10 and transmit that amount to

MTDCPAC weekly. *Id.* at 12–13.

The CBA also imposes three record keeping duties on covered employers: (1) "The

books and records of the Employer shall be made available at all reasonable times for inspection

and audit by the accountants or other representatives of the Trust Funds . . . and/or the Union's

authorized representatives;" (2) the "records of any affiliate, subsidiary, alter ego, joint venture,

successor or related company of the Employer shall also be made available at all reasonable

times for inspection and audit by the accountants of the Trust Funds set forth in this Article of

the Agreement;" and (3) "[t]he Employer shall retain, for a minimum period of six years, payroll

and related records necessary for the conduct of a proper audit in order that a duly designated

representative of the Trustees may make periodic review to confirm that contributions owed

pursuant to this Agreement are paid in full." *Id.* at 16.

While the CBA does not specify the details of the required audit procedures, it does state,

"The Employer agrees to and shall be bound by all terms and conditions of the Trust Agreement

creating the Trust Funds set forth in this Article of the Agreement and by any rules regulations or

By-Laws adopted by the Trustees of the Funds to regulate said Funds." *Id.* at 15. Each of the

Funds has Trust Agreements that empower the Board of Trustees to "implement and maintain

any accounting, auditing, computer, recordkeeping and other systems which the Board or the

Fund Director has determined to be necessary or appropriate for the establishment, operation or

administration of the Trust Fund or the Plan." Doc. 141-1, 27 (Welfare Fund Trust Agreement);

Doc. 141-2, 27 (Pension Fund Trust Agreement); Doc. 141-3, 27 (Annuity Fund Trust

Agreement).  *See also* Doc. 141-4, 29 (the Training Fund Trust Agreement provides, "The

Trustees may call upon the Employers and/or the Union to Furnish to the Trustees such

information and reports as they may require in the performance of their duties under this Trust

Agreement.").

The CBA provides damages for breach:

> If an audit of the Employer's books and records is required and a
> deficiency in fringe benefit fund contributions or remittance of
> working dues check-offs or MTDCPAC contributions is found
> which is not paid within seven days after reasonable notice, the
> Employer agrees to pay as additional liquidated damages twelve
> percent, or the percentage rate prescribed under Section 6621 of
> Title 26 of the United States Code, whichever is greater, of the
> amount owing from the close of business of the day on which any
> such payment was initially due to the date actually paid, plus the
> cost of all audit, accountants', attorneys' and other fees necessary
> to effect collection of the deficiency.

Doc. 141-5, 17.

In March 2006, one year after entering the CBA, LaBarca established Phase Construction

because he "didn't like the name SL construction."  Doc. 141-13, 59; Doc. 141-8, 2.  In early

2013, a Union member performed work for SL Construction, received payment from Phase

Construction in what the member alleged was a violation of the CBA, and complained to the

Union.  Doc. 141-25, 17.  The Union raised the member's concern with LaBarca and the parties

settled the grievance as documented in two letters:  On October 16, 2013, LaBarca signed a letter

that provided that "S-L Construction, Inc., is a signatory to a Trade Agreement with the Mason

Tenders District Council of Greater New York (the 'Union') dated July 1, 2005," that "Phase

Construction Services, Inc. is a closely related company within the Union's jurisdiction," and

"that this second company is bound by all of the terms and conditions of the Trade Agreement,"

Doc. 141-26; and on October 23, 2013, LaBarca signed another letter that provided "that the two

referenced companies[, SL Construction and Phase Construction,] are a single employer, are both bound to the Trade Agreement effective the date specified therein, and are jointly and severally liable for each other's obligations and liabilities," Doc. 141-27.

For a number of years, the Funds retained Schultheis & Panettieri, LLP, ("S&P") to perform the audits required under the CBA. Doc. 141-29, ¶ 3. On November 14, 2013, S&P mailed an Audit Request to Phase Construction to inform it that it would review its records from January 1, 2008, to November 14, 2013, to determine whether Phase Construction made the contributions required under the CBA. Doc. 141-38. In March 2014, S&P inspected Phase Construction's records over a period of five days. Doc. 141-29, ¶ 19. During the payroll audit, S&P reviewed Phase Construction's weekly payroll reports and consulted its timesheets to verify each member's hours. Doc. 141-31, 13–14. Phase Construction did not provide a general ledger, cash disbursements, or bank statements for review. Doc. 141-31, 14. S&P, however, gathered enough information to exclude hours performed outside of the Union's jurisdiction. *Id.* at 13.

During the audit, LaBarca told S&P that "[t]he individuals assessed are laborers and sometimes work in [the Union's] jurisdiction" and that "[h]e is aware that he may owe a lot of money." Doc. 141-31, 13. Phase Construction produced a document titled "2013 Employees Phase Construction," and of the people identified by S&P as covered employees in 2013, all appear on the 2013 Employees sheet as "laborers." *Compare* 141-46, 31–32 *with* Doc. 141-45, 3.

On April 18, 2014, S&P issued its report, explaining that it "identified all covered work for which the employer is required to remit contributions to the Funds," compared the "total payroll hours for employees performing covered work . . . to total hours reported," and found

"[a] deficiency totaling $519,046.85." Doc. 141-46, 14–15. S&P attached an appendix to its report that documented the deficiency in detail, cataloging the name of each covered employee, the dates and hours that they worked for Phase Construction, and the amount of money owed to the Funds, Union, and MTDCPAC. *Id.* at 23–33. The chart identified nineteen individuals as employees covered by the CBA that Phase Construction had failed to report. *Id.*[5] The report made these findings but emphasized that "[w]e were not engaged to and did not conduct an audit, the objective of which would be the expression of an opinion on whether employers remitted contributions to the Funds in accordance with the various collective bargaining agreements." *Id.* at 16.

By cover letter issued the same day, April 18, 2014, S&P shared its preliminary findings with Phase Construction and attached the chart described in the previous paragraph. Doc. 141-47, 3–9. The letter explained, "if you are not in agreement with our findings, please submit to our office, within ten business days, your exceptions along with any and all supporting documentation." *Id.* at 2. Phase Construction did not respond within ten days.

Approximately one month later, in a May 20, 2014 letter, the Funds informed Phase Construction that "[a]n independent auditor recently conducted an examination of the available payroll records of your company for the period 01/14/08 to 12/29/13 on behalf of the" Funds and found that Phase Construction owed $480,438.48 in unpaid benefits, $230,610.47 in audit costs, $38,607.57 in dues check offs and MTDCPAC contributions, and $33,916.28 in interest. Doc. 141-46, 5.

---

[5] Andre T. Deller, Ambiorix Hernandez, Christopher Evangelista, Edward Califano, Edwin Lopez, Erick Vasquez, Javier R. Bravo, Johnny Potes, Julio C. Herrera, Jr., Kelsey Smalls, Lamar Odom, Mamadou Yade, Miguel Vasquez, Robert Fiore, Richard Ramirez, Ruben Calderon, Stephen C. Cruz, Walter Martinez, and Yauheni Fedarovich. *Id.* at 23–33.

In a May 30, 2014 letter, Defendants' counsel mailed S&P a letter "request[ing] . . . additional required time to review the findings and draft a response" because the April 18 "Letter was only received around the first week in May," well after the April 28 deadline had passed. Doc. 141-49, 2–3.

In a June 23, 2014 letter, the Funds mailed Phase Construction a Final Request Notice for $480,438.48 in unpaid benefits, $230,610.47 in audit costs, $38,607.57 in check-off dues and MTDCPAC contributions, and $35,117.38 in interest. Doc. 141-46, 2. The notice further provided, "If you fail to make payment of the above total amount within ten (10) days of the date of this letter, the Fund will immediately refer this matter to legal counsel who may institute suit in Federal Court to collect the amount due and the additional damages to which the Fund is entitled under the [ERISA]." 141-46, 2.

In a July 1, 2014 letter, Defendants' counsel challenged "the inclusion of claims for Phase Construction Services for the period of January 14, 2008 through December 29, 2013 as alleged unpaid fringe benefits" because "[t]he accounting breakdown did not make any explanation of these charges" and because "we do not have any document or agreement reflecting Phase Construction Services' contractual obligation to compensate Mason Tenders in any fashion." Doc. 141-50, 1–3. On August 1, 2014, the Funds, the Union, and the Funds' Director filed the instant suit against SL Construction and Phase Construction for violating the CBA, ERISA, and the LMRA. Doc. 1.

On March 31, 2016, during discovery, LaBarca's accountant testified at a deposition that LaBarca opened another construction company, Phase NY, at the end of 2015, more than one year after Plaintiffs had filed their initial complaint. Doc. 141-14, 11. *See also* Doc. 141-9 (state records indicating that Phase NY opened in November 23, 2015).

Plaintiffs also learned during discovery that SL Construction, Phase Construction, and Phase NY maintained a close relationship and shared a physical address,[6] a website,[7] the same owner,[8] a manager,[9] customers,[10] equipment,[11] insurance,[12] construction contracts,[13] and

---

[6] Doc. 141-12, ¶ 2; Doc. 141-74, 2; Doc. 141-75, 2; Doc. 141-76, 2.

[7] Doc. 141-16 (Phaseny.com references SL Construction's, Phase Construction's, Phase NY's, and La Barca's experience, services, and clients but omits all reference to SL Construction and Phase NY).

[8] The tax returns of SL Construction, Phase Construction, and Phase NY show that LaBarca owns all shares of each company. Doc. 141-74, 7; Doc. 141-75, 7; Doc. 141-76, 7.

[9] In his 2018 affidavit, LaBarca stated, "While there are no exact titles or positions held by any employee for labor relations of Corporate Defendants I am left considering myself the person responsible for labor relations of the Corporate Defendants from January 1, 2013 to the present." Doc. 141-12, ¶ 13.

[10] On their website, Phaseny.com, the three companies list twenty two clients: Arch Capital Group LTD, A&E Television Network, CB Richard Ellis, Cole Haan, CUNY, La Prairie, Langan Engineering & Environmental, Hersha Development, Intergap, Green Realty, Corp., ReSources, Brookfield Properties, First Quality Maintenance, Foot Locker, Inc., Pyramid Network/Motorola, Paul Mitchell/Cactus Salon, Ironshore Insurance, Renaissance Hotel, Barr & Barr, Equity Office, Thor Equities, and Normandy Real Estate. Doc. 141-16, 6. SL Construction listed seven of those clients as its own. *See, e.g.*, Doc. 141-67, 3 (Arch Insurance, 2006), *id.* (Cole Haan, 2006), *id.* (A&E Television Network, 2006), *id.* (La Prairie, 2006), *id.* (CB Richard Ellis, 2006), *id*. at 6 (Hersha Development, 2008), Doc. 141-68, 2 (Ironshore, 2008). Additionally, in response to the question was Game Show Network "improperly listed on the reference page?" of a Phase Construction sales document, LaBarca answered, "probably, yes," and explained that he listed it "for sales purposes, to make my company saleable." Doc, 141-13, 137.

[11] Phase Construction agreed to lease a multifunction printer from a rental company, Doc. 141-80, 18, but it listed Phase NY as the company name of the installation site, *id.* at 19.

[12] LaBarca affirmed in his affidavit, "I believe all corporate Defendants are insured by the State Insurance Fund under" the same policy number and "I do not know of any other insurance contracts presently held by any of the corporate Defendants." Doc. 141-12, 5.

[13] In an Application and Certificate for Payment, Phase NY indicated that it had entered into a General Construction Contract with HHLP MSG Lessee, LLC, to perform work on project number PNY16-001 at Hampton Inn-Madison Square Garden. 141-79, 2. As of February 24, 2016, the "Total Earned Less Retainage" was $738,700.78. 141-79, 2. In a General Contractor Unconditional Waiver and Release Upon Progress Payment, Phase Construction represented that it "had provided labor, services, materials, and equipment to make improvements for the Project identified above," project number PNY16-001 at Hampton Inn – Madison Square Garden, owned by HHLP MSG Lessee, LLC. *Id.* at 6. As of February 24, 2016, Phase Construction "has now received a total of $738,700.78." *Id.* Similarly, in 2009, SL Construction served as a general contractor for project number PH09-032-044, entered into an Employer's Remittance Agreement and Report with the Funds for that project and remitted $10,900.62. Doc. 141-60, 3. SL Construction sent a purchase order to the Union for that project, PH09-032-044, for $10.900.63, and listed Phase Construction as the "Bill To" address. *Id.* at 2.

capital.[14]  Specifically, from 2008 to 2017, the three companies transferred $3,108,936.61

between them, and of the money transferred, $2,985,080.59 moved without any documentation.

Doc. 139-1.  From its inception in 2015 until 2017, Phase NY received $413,500 from the other

corporate Defendants and transferred $347,620.57, in return.  *Id.*  SL Construction and Phase

Construction also shared the same employees,[15] retirement plan,[16] and administrative services.[17]

Furthermore, Phase Construction has identified *itself* as closely related to SL

Construction on a number of occasions:  In a 2009 application for the New York City School

Construction Authority, Phase Construction wrote that it had previously "operated under" the

name "SL Construction Group, Inc.," Doc. 141-11, 3; in a 2009 URS Bidder Pre-Qualification

Application, Phase Construction reported that it had "labor agreements with New York labor

organizations" including "Mason Tenders District,"  Doc. 141-17, 2; in the October 16, 2013

---

[14] SL Construction—not Phase Construction—maintained an American Express card, Doc. 141-13, 147–148, but Phase Construction paid SL Construction's American Express bill.  Doc. 141-55, 2.

[15] Christopher Catapano and Michael Zahralban worked for SL Construction in 2007, Doc. 141-56, 2–3, and for Phase Construction in 2011, Doc. 141-57, 2.  In 2014, Angel De Jesus, a unionized laborer, submitted timesheets to SL Construction and hand-written notes on the timesheets indicate that the Phase Construction should pay the bill.  Doc. 141-61, 2 (week ending in 5/4/14), 4 (week ending in 4/27/14), 8 (week ending in 4/13/14), 9 (week ending in 4/6/14).  According to LaBarca's deposition, Phase Construction employed ten people, and of those ten people, five performed the same functions for Phase Construction and for SL Construction:  "Q.  And does [Ms. Campos' work responsibilities for Phase] differ in any way from her office responsibilities for SL? A.  No. Q.  How about Ms. Silva, same question?  A.  Same answers.  Q.  Are Oscar Aparicio's job responsibilities different for Phase than for SL? . . . A.  No.  . . .  Q.  Do Richard Jean's job responsibilities for SL differ from his job responsibilities at Phase? A.  No. . . .  Q.  Did Richard Rosario's job responsibilities at Phase differ from those at SL? A.  No."  Doc. 141-13, 63–64, 66–67.  LaBarca struggled to identify whether employees, such as his sister, worked for Phase Construction or SL Construction.  Doc. 141-13, 46–47 ("In what capacity did Ms. LaBarca - - what company did she work for? A.  I don't recall.  I believe SL.  Q.  What company paid her I guess was a better question?  A.  I don't recall.").

[16] According to the June 30, 2009 Combined Financial Statements of Phase Construction Services, Inc. and SL Construction Group, Inc., SL Construction and Phase Construction "adopted a 401(k) profit sharing plan in 2005, which covers all eligible employees not covered by collective bargaining agreements."  Doc. 141-51, 16.

[17] LaBarca testified that the office manager at SL Construction does payroll for Phase Construction.  Doc. 141-13, 42 ("Q.  What companies does the office manager at SL do the payroll for?  A.  Phase Construction.").  *See also Id.* at 44–45 ("[Y]our testimony was Ms. Silva is responsible for calling in the payroll? A.  The hours, yes . . .  Q.  She does that for Phase Construction?  A.  Yes.  Q.  Does Ms. Silva also call in the hours for SL Construction? A.  Yes.").

letter, discussed above, LaBarca agreed that "Phase Construction Services, Inc. is a closely related company within the Union's jurisdiction," Doc. 141-26; and in the October 23, 2013 letter, also discussed above, LaBarca agreed "that the two referenced companies[, SL Construction and Phase Construction,] are a single employer, are both bound to the [CBA] effective the date specified therein, and are jointly and severally liable for each other's obligations and liabilities." Doc. 141-27.

Plaintiffs also discovered that LaBarca had blurred the lines between SL Construction, Phase Construction, Phase NY, and his personal expenses. In its tax returns, Phase Construction reported personal loans to LaBarca in excess of $3.48 million: $169,231 in 2008, $98,213 in 2009, $862,260 in 2010, $969,526 in 2011, $1,153,998 in 2012, $202,669 in 2013, and $30,045 in 2015.[18] In its tax returns, SL Construction also reported personal loans to LaBarca in excess of $1.97 million: $570,733 in 2008, $553,283 in 2009, $94,230 in 2011, $324,189 in 2012, $429,468 in 2013.[19]

When asked to explain these loans during his deposition, LaBarca stated, "I needed money, so I borrowed money," and, when asked whether he "recall[ed] paying back any of those loans," LaBarca answered "No, I don't. My accountant would know." Doc. 141-13, 153. In her deposition, LaBarca's accountant stated, "There were times when he loaned Phase or SL possibly money and it would have been posted up against this officer's loan account" but when asked whether the accountant was in a position to provide any information about a particular loan, the accountant answered, "No, I'm not." Doc. 141-14, 32, 112 .

---

[18] Docs. 141-88, 5; 141-90, 21; 141-92, 9; 141-94, 14; 141-96, 5; 141-98, 6; 141-86, 5.

[19] Docs. 141-89, 4; 141-91, 5; 141-95, 13; 141-97, 5; 141-99, 5.

According to bills produced by Defendants, SL Construction and Phase Construction paid for at least the following of LaBarca's personal expenses:

- $15,000 for two nights in a hotel in Manchester, Vermont, Doc. 142-15, 8, Doc. 142-16, 7;
- $10,895 for LaBarca's "Ferrari expenditures," Doc 142-32, 5;
- $8,817.90 for membership fees at a New York Sports Club in Long Island, 142-1, 4–5;
- $5,321 for taxes owed by LaBarca and his wife, Doc. 141-43;
- $5,047.66 for medical expenses, Doc. 142-1;
- $5,199 for tuition/fees at Tiger Shulman's Martial Arts, *id.* at 4–5;
- $5,000 for a "College Savings Advisor Plan," Doc. 141-44;
- $3,000 for "interior design project at LaBarca residence," Doc. 148-2;
- $2,230.80 for a mortgage on a Florida home, Doc. 148-3;
- $1,267.97 for a mortgage on a Long Island home, Doc. 141-41;
- $1,185.41 for monthly dues at Life Time Fitness in Long Island, 142-1, 5;
- $825.05 for a home power bill in Long Island, Doc. 141-39;
- $626.03 for jewelry, Doc. 141-101, 25;
- $620.34 for a rental car in Florida, Doc. 141-100, 11;
- $261.55 for his wife's plane ticket to Utah, *Doc.* 141-100, 6;
- $261.55 for his son's plane ticket to Utah, *id.*;
- $261.55 for his daughter's plane ticket to Utah, *id.*;
- $243.86 for jewelry, Doc. 141-102, 5;
- $74.48 for a home power bill in Florida, Doc. 141-42;
- $63.05 for LaBarca's phone bill, Doc. 141-40; and
- $40.24 for LaBarca's wife to eat at a restaurant in Atlantic City, Doc. 141-102, 4.

LaBarca's sister, who described her job as "watch[ing] my brother's money," Doc. 148-1, 38, could not explain why LaBarca made many of these purchases on the corporate business card:

> Q. Why would you have written a check for an expenditure for Mr. LaBarca's Ferrari on the corporate credit card?
> A. I would not question Sal's credit card. It's Sal's company.

*Id.* at 102.

> Q. Do you know how $243.86 for jewelry could be a corporate expense?
> A. No, I do not.

*Id.* at 102.

Q. How an expenditure for [LaBarca's wife] to go to Atlantic City could be a business expense on the corporate credit card?
A. I can't explain that.

*Id.* at 104.

Q. Can you explain how a $700 car rental [in Fort Lauderdale,] would be a business expenditure on the corporate credit card?
A. No, I can't explain.

*Id.* at 108.

Q. Can you explain how [LaBarca's wife] would be traveling on a corporate credit card?
A. I cannot explain that.

*Id.* at 110.

Q. Can you explain how their son . . . would be traveling on the corporate credit card?
A. I can't explain that.

*Id.* at 110.

Q. Can you explain how [their daughter] would be traveling on the corporate credit card?
A. No, I cannot.

*Id.* at 111.

LaBarca's accountant testified that she informed LaBarca that these loans "should bear interest or be repaid," Doc. 141-14, 109, but Defendants have provided no evidence that LaBarca followed his accountant's advice.

This evidence, summarized above, comes from Defendants' tax returns, bills, and depositions. It does not originate from other expected sources of information, such as board meetings, corporate minutes, by-laws, operating agreements, and loan documents because, except for one SL Construction Board of Directors' meeting on March 23, 2005, Defendants have not produced evidence of these corporate formalities.

On June 2, 2016, after discovering many of the aforementioned facts, Plaintiffs successfully moved to compel the production of outstanding discovery materials and to amend

their complaint by adding Phase NY and LaBarca as defendants.  Doc. 77.   As a discovery

sanction, the Court awarded Plaintiffs $13,194.50 for attorneys' fees and costs.  Doc. 98.

## II.        Standard

Summary judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the

evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno*

*v. Elmsford Union Free Sch. Dist.*, 812 F.Supp.2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint*

*Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it "might

affect the outcome of the litigation under the governing law."  *Id.* (internal quotation marks

omitted).  The party moving for summary judgment is first responsible for demonstrating the

absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).  If the moving party meets its burden, "the nonmoving party must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment."  *Saenger v. Montefiore Med. Ctr.*, 706 F.Supp.2d 494, 504 (S.D.N.Y. 2010) (internal

quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir.

2008)).

"When confronted with cross-motions for summary judgment, the Court analyzes each

motion separately, 'in each case construing the evidence in the light most favorable to the non-

moving party.'"  *Peterson v. Kolodin*, No. 13 Civ. 793 (JSR), 2013 WL 5226114, at *1

(S.D.N.Y. Sept. 10, 2013) (quoting *Novella v. Westchester Cty.*, 661 F.3d 128, 139 (2d Cir.

2011)); *see also Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach

party's motion must be examined on its own merits, and in each case all reasonable inferences

must be drawn against the party whose motion is under consideration.") (citation omitted).  The

Court is not required to resolve the case on summary judgment merely because all parties move for summary judgment. *Morales*, 249 F.3d at 121.

## III.    Jurisdiction

Defendants urge the Court not to exercise jurisdiction over this case because "the claims raised in this proceeding flow directly from and are expressly included in the CBA's scope of arbitrability." Doc. 157-1, 23. To support this argument, Defendants rely on the CBA. However, while the CBA does include an internal grievance and arbitration procedure, it makes these procedures permissible—not mandatory. Doc. 141-5, 20 ("The Union *may* submit disputes arising between the parties involving questions of interpretation or application of this Agreement . . . as a grievance under the following rules") (emphasis added). It further explains, "The proceedings provided for in this Article need not be exhausted as a condition precedent to the Fund commencing any suit available to it." *Id.* at 21–22. Here, Plaintiffs filed suit in federal court and Defendants never moved to compel arbitration. As a result, neither the Union nor the Funds agreed to arbitrate these claims. "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001) (internal quotation marks omitted). Moreover, "a party waives its right to arbitration when it engages in protracted litigation that prejudices the opposing party." *PPG Indus., Inc. v. Webster Auto Parts, Inc.*, 128 F.3d 103, 107 (2d Cir. 1997).

The Court may exercise jurisdiction over this case. The Court has jurisdiction over the Funds, as the Funds have standing to sue under ERISA. Section 515 of ERISA provides that:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. Section 502 of ERISA further provides that "the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter." 29 U.S.C.A. § 1132(e)(1).

"[S]ections 502 and 515 clearly give a district court subject matter jurisdiction to hear an action brought by benefit plan trustees to enforce an employer's promise to make contributions." *Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 312–13 (2d Cir. 1990) (treating a fund and its trustee interchangeably for the purposes of deciding jurisdiction).

The Court also has jurisdiction over the Union, which may sue under the LMRA. Section 301 provides as follows:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). "Section 301 authorizes suits for the violation of a contract between an employer and a labor organization representing employees in an industry affecting commerce." *Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Servs. Fund & Annuity Fund v. Lollo*, 35 F.3d 29, 34 (2d Cir. 1994), *as amended* (Sept. 9, 1994). John J. Virga, "as administrator of the Funds, may sue on behalf of the Funds as third party beneficiaries of the collective bargaining agreement." *Id.* at 34–35.

## IV.    Standing

Plaintiffs also have standing to bring this case. "Three elements of Article III standing are (1) an 'injury in fact' that is (2) causally related ('fairly traceable') to the challenged action and (3) likely to be redressed by a favorable court decision." *Coal. of Watershed Towns v. EPA*, 552 F.3d 216, 217–18 (2d Cir. 2008). "Any monetary loss suffered by

the plaintiff satisfies the injury-in-fact element . . . ." *Chevron Corp. v. Donziger*, 833 F.3d 74, 120 (2d Cir. 2016). Defendants claim that Plaintiffs lack standing because they have not suffered a monetary loss. Doc. 157-1, 9–10. The Court addresses those arguments in the next section and explains how Plaintiffs have suffered a monetary loss.

## V.  Discussion

Plaintiffs seek damages from the three Corporate Defendants' alleged violations of the CBA. To succeed on this claim, Plaintiffs must show that the CBA covered Phase Construction, that Phase Construction violated the CBA, and that the Plaintiffs may collect from Defendants.

### A.  The CBA's Scope

Neither Phase Construction nor Phase NY signed the CBA. Plaintiffs argue that the CBA nonetheless applies to Phase Construction and Phase NY because they are alter egos of SL Construction and because the three entities constitute a single employer.

### 1.  Alter Ego

SL Construction, Phase Construction, Phase NY are alter egos. "The alter ego doctrine provides an analytical hook to bind a non-signatory to a collective bargaining agreement." *Truck Drivers Local Union No. 807, I.B.T. v. Reg'l Imp. & Exp. Trucking Co.*, 944 F.2d 1037, 1046 (2d Cir. 1991). "[T]he test of alter ego status is flexible, allowing courts to weigh the circumstances of the individual case, while recognizing that the following factors are important: whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *Ret. Plan of UNITE HERE Nat. Ret. Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 288 (2d Cir. 2010) (internal quotation marks omitted). "The purpose of the alter ego doctrine in the ERISA context is to prevent an employer from

evading its obligations under the labor laws through a sham transaction or technical change in operations." *Id.*

Six of the seven factors identified by *Kombassan Holding A.S.* weigh in favor of finding that SL Construction, Phase Construction, and Phase NY are alter egos. The remaining factor weighs in favor of holding that SL Construction and Phase Construction are alter egos.

First, the three Corporate Defendants have the same ownership. As evidenced by their respective tax returns, LaBarca owns all of the shares of each of the three companies. Doc. 141-74, 7; Doc. 141-75, 7; Doc. 141-76, 7. Second and third, the same people manage and supervise the three Corporate Defendants. In his 2018 affidavit, LaBarca stated, "While there are no exact titles or positions held by any employee for labor relations of Corporate Defendants I am left considering myself the person responsible for labor relations of the Corporate Defendants from January 1, 2013 to the present." Doc. 141-12, ¶ 13. Along the same lines but only for SL Construction and Phase Construction, LaBarca deposed that Phase Construction employed ten people, Doc. 141-13, 63–64, and that, of those ten people, five performed the same functions for Phase Construction and for SL Construction. *Id.* at 66–67.

Fourth, SL Construction and Phase Construction had the same business purpose. LaBarca formed SL Construction to provide construction services and then he created Phase Construction because he "didn't like the name SL Construction." Doc. 141-13, 37–38, 59–60. When asked, "How are Phase and SL different?" LaBarca answered, "They have different names . . . , different addresses, [and] different employees." *Id.* at 60. In response to the follow up question, "Anything else?" LaBarca testified "No." *Id.*[20]

---

[20] As explained above, contrary to LaBarca's testimony, the evidence proffered by Plaintiffs shows that SL Construction and Phase Construction shared an address and many employees. For example, as discussed above,

Fifth and sixth, the Corporate Defendants had the same operation and shared the same equipment. According to LaBarca's testimony, a worker in "the field goes to the jobs directly," but "[e]verybody operates out of" the same address, "everything else comes out of the warehouse," and "[t]hat's where all the equipment is" "for Phase," and "for SL." Doc. 141-13, 60–61. Similarly, Phase Construction requested payment for work performed by SL Construction, Doc. 141-60, 2, Phase Construction received payment for an entire contract entered into by Phase NY, Doc. 141-79, 6, and Phase Construction leased a multifunction printer for Phase NY, Doc. 141-80, 18–19.

Seventh, the three Corporate Defendants had many of the same clients. On their website, Phaseny.com, they list twenty-two clients. Doc. 141-16, 6. In its project log and timesheets, SL Construction listed seven of those clients as its own. Doc. 141-67, 3, 6; Doc. 141-68, 2 –3.

## 2. Single Employer

The Corporate Defendants are also a single employer. The single employer doctrine and the alter ego doctrine are "conceptually distinct," *Reg'l Imp. & Exp. Trucking Co.*, 944 F.2d at 1046, but the Court's analysis of the alter ego doctrine applies with equal force to its application of the single employer test. Indeed, to determine whether two companies qualify as a single employer, the Court considers four non-controlling factors: "(1) interrelation of operations, (2) common management; (3) centralized control of labor functions and (4) common ownership." *Brown v. Sandimo Materials*, 250 F.3d 120, 129 n.2 (2d Cir. 2001). As was true in the alter ego context, all of these factors weigh in favor of finding that SL Construction, Phase Construction, and Phase NY are a single employer. Moreover, in the October 23, 2013 letter,

LaBarca deposed that, of the ten people employed by Phase Construction, five performed the same functions for SL Construction. *Id.* at 66–67.

LaBarca agreed "that the two referenced companies [, SL Construction and Phase Construction,] are a single employer, are both bound to the Trade Agreement effective the date specified therein, and are jointly and severally liable for each other's obligations and liabilities." Doc. 141-27.

The Court's conclusion that the Corporate Defendants qualify as a single employer "has independent legal significance," and indeed, "that finding is enough to hold them jointly and severally liable for each other's debts and obligations, including financial obligations under the collective bargaining agreement." *Lihli Fashions Corp. v. NLRB*, 80 F.3d 743, 748 (2d Cir. 1996), *as amended* (May 9, 1996) (per curiam). This conclusion, however, does not resolve another important issue in this case because "a collective bargaining agreement may be enforced against non-signatory employers if the employers constitute a 'single employer' *and* if the employees of the companies constitute a single appropriate bargaining unit." *Brown*, 250 F.3d at 129 n.2 (emphasis added). To decide whether a group of "employees constitute[s] a 'single bargaining unit,' we look for a community of interests among the relevant employees and factors such as bargaining history, operational integration, geographic proximity, common supervision, similarity in job function and degree of employee interchange." *Id.* (internal quotation marks and citations omitted).

SL Construction's employees covered by the CBA and the nineteen employees identified by the payroll audit of Phase Construction qualify as a single bargaining unit. As explained above, Phase Construction and SL Construction "were operationally integrated, operated out of the same geographic location, were under common supervision, and shared employees and lines of business." *Trustees of New York City Dist. Council of Carpenters Pension Fund, Welfare Fund, Annuity Fund v. Vintage Tile & Flooring, Inc.*, No. 14 Civ. 06450 KBF, 2015 WL

3797273, at *4 (S.D.N.Y. June 18, 2015). *See also Trustees of Local 813 Ins. Tr. Fund v. Rogan Bros. Sanitation Inc.*, No. 12 Civ. 6249 ALC, 2018 WL 1587058, at *10 (S.D.N.Y. Mar. 28, 2018) (finding that employees constituted a single bargaining unit because "there was operational integration and shared common facilities, equipment, management, and customers"). Furthermore, according to S&P's audit notes, LaBarca indicated during the payroll audit that "[t]he individuals assessed are laborers and sometimes work in [the Union's] jurisdiction" and that "[h]e is aware that he may owe a lot of money." Doc. 141-31, 13. As a result, their employees qualify as a single bargaining unit.

Defendants raise six counterarguments. The Court does not find any persuasive. First, they claim that "Plaintiffs have not alleged any intent by Defendants to avoid the Union Dues." Doc. 168, 17. This argument is of no moment because, as explained by the Second Circuit, "an anti-union animus or an intent to evade union obligations is not a *necessary* factor" for the alter ego doctrine. *Kombassan Holding A.S.*, 629 F.3d at 288 (internal quotation marks omitted).

Second, Defendants note that "it is clear based on the Plaintiffs' owns submissions that each entity files its own tax returns under its own EIN." Doc. 168, 17. While this fact may constitute some evidence that the Corporate Defendants observed corporate formalities, the vast majority of the uncontested evidence suggests that such formalities were not followed. In any event, Defendants have not explained the relevance of this factor under either the alter ego or single employer tests.

Third, Defendants assert that "[e]ach entity was formed for a different purpose since each business is substantially different and their operations are not the same." Doc. 168, 17–18. The Court rejects this argument as conclusory because Defendants do not direct the Court's attention

to any facts in the record to support this assertion. More to the point, the evidence proffered by Plaintiffs highlighted above establishes that they are alter egos of each other.

Fourth, Defendants argue that "[i]n order for this Court to determine either single employer or alter ego status of the several corporate defendants it must blindly conclude Plaintiffs' opinions and unilateral unverified interpretations appearing in its Rule 56.1 Statements are credible." Doc. 168, 18. The Court disagrees. Plaintiffs' Rule 56.1 Statement expressly relies on documents and testimony produced by Defendants during discovery—not Plaintiffs' opinions.

Fifth, Defendants claim, "Plaintiffs' utter failure to shortly or concisely identify any relevant facts supporting which defendants fall into a single employer status supports denial of Plaintiffs' demands for such treatment." Doc. 168, 14. As explained above, Plaintiffs relied on admissible evidence obtained during discovery, including individual deposition testimony of LaBarca, his sister, and his accountant, sufficient to establish that the three corporations are a single employer.

Sixth, Defendants argue that the Court may not hold that the Corporate Defendants are a single employer and that their employees qualify as a single bargaining unit because "the entities perform different work." Doc. 168, 14. To support this position, Defendants cite to three portions of LaBarca's deposition transcript. *Id.*

> Q. How are Phase and SL different?
> Mr. Whitehorn: Objection form.
> The Witness: They have different names.
> Q. Okay.
> A. Different addresses, [and] different employees.

Doc. 141-13, 60 (page 59 of the deposition, lines 10-14).

> Mr. Whitehorn: [I]t do nonunion work?
> Mr. Bond: Any union work?

Mr. Whitehorn:  Any union work.  Okay.
Q.  Does Phase make contributions to Local 79?
A.  I don't know.
Q.  How many employees does Phase currently have?

*Id.* at 64 (page 63 of the deposition, lines 20-25).

Q.  Does Phase handle projects within the five boroughs?
A.  Yes.
Q.  And New Jersey?
A.  Yes.
Q.  Does Phase handle projects anywhere else?
A.  Yes.
Q.  Where else?
A.  I work nationally with Phase Construction.
Q.  Can you give me some examples?
A.  Chicago, LA, San Francisco.  There is more if you need.
Q.  To your knowledge, does Phase do any union

*Id.* (page 63 of the deposition, lines 1-13).

The first and third excerpts do not create a genuine dispute as to any material fact.  Fed.

R. Civ. P. 56(a).[21]  As an initial matter, little of the quoted material contradicts the facts and

documents obtained during discovery.  Even if SL Construction and Phase Construction did not

have identical employees or clients, they would still qualify as alter egos and a single employer

because they are "substantially identical."  *Kombassan Holding A.S.*, 629 F.3d at 288.

Moreover, "the test of alter ego status is *flexible*," *id.* (emphasis added), and single employer test

turns on four *non-controlling* factors, *Brown*, 250 F.3d at 129 n.2.

Assuming, *arguendo*, that the material quoted from LaBarca's deposition did dispute

dispositive facts, the Court would come to the same result.  LaBarca's more recent self-serving

claims contradict his earlier representations that "[t]he individuals assessed are laborers and

sometimes work in [the Union's] jurisdiction," Doc. 141-31, 13, that "[e]verybody operates out

---

[21] The remaining excerpt, the second one, strikes the Court as irrelevant and unintelligible because it merely
documents a discussion between counsel, an example of LaBarca's lack of knowledge, and an unanswered question.

of" the same address, Doc. 141-13, 60–61, and "that the two referenced companies [, SL Construction and Phase Construction,] are a single employer, are both bound to the Trade Agreement effective the date specified therein, and are jointly and severally liable for each other's obligations and liabilities," Doc. 141-27. As a result, the Court concludes that no reasonable person could believe this portion of LaBarca's testimony, even after making all inferences in the light most favorable to LaBarca. Deciding this case on summary judgment is appropriate despite the statements made by LaBarca during his deposition. As the Second Circuit held:

> In the circumstances presented in the instant case—where (1) the District Court found nothing in the record to support [nonmovant's] allegations other than [nonmovant's] own contradictory and incomplete testimony, and (2) the District Court, even after drawing all inferences in the light most favorable to the [nonmovant], determined that "no reasonable person could believe [nonmovant's] testimony," *Jeffreys,* 275 F.Supp.2d at 477—we hold that the District Court did not err by awarding summary judgment.

*Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005)

Accordingly, the Court concludes that SL Construction, Phase Construction, and Phase NY are alter egos and a single employer. The Court also concludes that the nineteen employees identified by the payroll audit of Phase Construction and SL Construction's employees qualify as a single bargaining unit.[22]

---

[22] The Court would hold that the CBA covered Phase Construction and Phase NY even if it found that the Corporate Defendants were neither alter egos nor a single employer. The CBA covers any other company "form[ed]" by SL Construction's "owner or principal" as long as that other company "perform[s] bargaining unit work within this jurisdiction." Doc. 141-5, 4. As explained above, LaBarca owns all Corporate Defendants and each Corporate Defendant performed substantially similar work. As a result, in light of the CBA's scope, the CBA covers, by its terms, Phase Construction and Phase NY.

**B.    The CBA's Breach**

Phase Construction breached the CBA.  "Courts have found it appropriate to rely on an audit or an auditor's opinion to prove that defendant employers did not make required contributions to funds." *Annuity, Welfare & Apprenticeship Skill Improvement & Safety Funds of Int'l Union of Operating Engineers, Local 15, 15A, 15C & 15D, AFL-CIO v. Eastport Excavation & Utilities Inc.*, 3 F. Supp. 3d 204, 216 (S.D.N.Y. 2014) (listing cases).  Within this District, however, courts have divided on how they may rely on an audit or an auditor's opinion.  Some have adopted an approach that places the initial burden on plaintiffs to prove the reasonableness of their calculations and, once plaintiffs have carried that burden, shifts it to the defendants to question the assumptions underlying plaintiff's calculations.  *See, e.g.*, *Trustees of Local 813 Ins. Tr. Fund*, 2018 WL 1587058, at *10.  Others have not applied this standard and have simply determined whether factual disputes about damages exist.  *See, e.g.*, *Demolition Workers Union v. Mackroyce Contracting Corp.*, No. 97 CIV. 4094 LMM, 2000 WL 297244, at *7 (S.D.N.Y. Mar. 22, 2000) ("This Court, however, will not employ the burden-shifting analysis described above at the summary judgment stage.").  The Second Circuit has not ruled on whether the first approach, which it calls the *"Combs* approach," or the second approach controls.  *Mastrandrea v. Nassau Land Improvement Co.*, 182 F.3d 900 (2d Cir. 1999) ("[T]his court has never had occasion to adopt the *Combs* approach.").

Under either approach, the Court finds it appropriate to rely on S&P's payroll audit.  In March 2014, S&P inspected Phase Construction's records over a period of five days.  Doc. 141-29, ¶ 19.  To identify all covered work, it reviewed Phase Construction's weekly payroll reports, consulted its timesheets, and excluded work performed outside of New York City, the Union's jurisdiction.  Doc. 141-31, 13–14.  It then compared the "total payroll hours for employees

performing covered work . . . to total hours reported," and found "[a] deficiency totaling $519,046.85." Doc. 141-46, 14–15. During the audit, LaBarca told S&P that "[t]he individuals assessed are laborers and sometimes work in [the Union's] jurisdiction" and that "[h]e is aware that he may owe a lot of money." Doc. 141-31, 13.

The Defendants never made any specific objection to the audit findings, necessitating that Plaintiffs bring the instant suit,[23] and they have produced no documents to credibly dispute S&P's findings. Indeed, the most relevant document that they produced, a document titled "2013 Employees Phase Construction," supports S&P's findings. Of the people identified by S&P as covered employees in 2013, all appear on the 2013 Employees sheet as "laborers." *Compare* 141-46, 31–32 *with* Doc. 141-45, 3. This audit, validated by LaBarca's comments and by Phase Construction's internal document, strikes the Court as reasonable and undisputed by fact.

Defendants make three counterarguments. First, they declare, without citing any provision of the CBA or legal authority, that S&P could not base its conclusion on a payroll audit and, instead, "had a duty to follow" a different type of audit procedure "in any audit of Defendant." Doc. 157-1, 16–17. This argument is not supported by Second Circuit case law, which has found that a payroll audit may establish employer liability. *See, e.g.*, *Bricklayers & Allied Craftworkers Local 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Const., LLC*, 779 F.3d 182, 185, 190 (2d Cir. 2015) (per curiam) (observing that an employer's "liability would certainly include the $451,300.52 in withheld fringe benefit contributions and deductions"

---

[23] Defendants' main objection was that Phase Construction could not be held liable for violations of a CBA that it did not sign. Doc. 141-50, 3. This objection is refuted by the October 16, 2013 letter indicating that Phase Construction "is bound by all of the terms and conditions of the Trade Agreement," Doc. 141-26, and the October 23, 2013 letter providing that Phase Construction and SL Construction "are both bound to the Trade Agreement," Doc. 141-27.

even though the District Court based its conclusions on a "payroll audit of the corporate defendant [performed] pursuant to the terms of the CBA.").

Second, they assert, without reference to the record, "Plaintiffs' accountants projected that any individual earning an hourly rate, even remotely similar to the rate earned by a mason tender had to be performing mason tenders' work regardless of what their real duties were," Doc. 157-1, 12, and that "[t]here was no inquiry into the status of the workers on any payroll or other further investigation in order to ensure the reasonableness of the calculations." Doc. 168, 26. These assertions lack citations to the record and contradict the evidence, cited by Plaintiffs, that S&P discussed the laborers' job duties with LaBarca during the audit. Doc. 140, 23. Specifically, LaBarca indicated during the payroll audit that "[t]he individuals assessed are laborers and sometimes work in [the Union's] jurisdiction." Doc. 141-31, 13.

Third, they make a string of assertions without explaining how they, if true, relate to the Court's analysis of the audit's adequacy. Doc. 168, 25–26 ("Plaintiffs . . . admittedly did not take any documents and just entered data into a program."); Doc. 157-1, 13 (S&P based its audit on "cursory information taken down by [a S&P employee]"); Doc. 157-1, 14 ("Neither the Plaintiffs nor the accountant have ever witnessed the work performed by Defendants' employees"). These observations are not relevant, let alone dispositive. An auditor can perform an adequate analysis of an employer by, as was the case here, reviewing an employer's records and speaking with "the person responsible for labor relations of the" employer. Doc. 141-12, ¶ 13. More importantly, Defendants have not directed the Court's attention to any evidence to doubt S&P's conclusions. As a result, the Court finds that the auditor followed reasonable procedures and that there is no genuine dispute about damages.

## C.    Veil Piercing

Plaintiffs have made a sufficient showing to pierce the veil of the three Corporate Defendants and collect from LaBarca individually.  "[A]n individual is not liable for corporate ERISA obligations solely by virtue of his role as officer, shareholder, or manager."  *Sasso v. Cervoni*, 985 F.2d 49, 50 (2d Cir. 1993).  However, "[t]he Supreme Court has consistently refused to give effect to the corporate form where it is interposed to defeat legislative policies" and "Courts have without difficulty disregarded form for substance where ERISA's effectiveness would otherwise be undermined."  *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1220 (2d Cir. 1987).

In *Lowen v. Tower Asset Mgmt., Inc.*, the Second Circuit affirmed a veil-piercing grant of summary judgment because "[a] failure to disregard the corporate form in the circumstances of the present case would fatally undermine ERISA."  829 F.2d at 1221.  The Circuit Court found that the corporate and individual defendants "intermix[ed]" assets "without observing the appropriate formalities," shared employees and office space, and kept the corporations "inadequate[ly] capitaliz[ed]" "in light of the nature of the businesses in which they were engaged."  *Id.* at 1221.

The Court follows this decision because "Federal common law governs whether the corporate veil may be pierced in an ERISA claim."  *Trustees of Local 813 Ins. Tr. Fund*, 2018 WL 1587058, at *14.[24]  As a result, for the reasons stated in *Lowen*, veil piercing is also

---

[24] Defendants argue that "Because SL Construction is [a] New York entity, New York law determines whether the corporate veil can be pierced in this instance."  Doc. 168, 19.   To support this argument, they cite *Fletcher v. Atex, Inc.*, 861 F. Supp. 242, 243 (S.D.N.Y. 1994).  *Fletcher*, however, is a tort case that does not involve ERISA or any similar federal statutory scheme.  Moreover, Defendants provide no explanation for why the Second Circuit's decision in *Lowen*, 829 F.2d at 1220, should not direct the Court's analysis of veil piercing in the ERISA context.  The Court applies the Circuit's law, follows *Lowen*, and pierces the corporate veils of SL Construction, Phase Construction, and Phase NY.

appropriate here.  In the instant case, the corporate and individual Defendants have intermingled assets.  According to their tax returns, Phase Construction and SL Construction made million-dollar loans to LaBarca and there is no evidence before the Court that LaBarca repaid any of these loans.  According to credit card statements, LaBarca also used the corporate credit card to pay for a wide range of personal expenses that his sister, who described her job as "watch[ing] my brother's money," Doc. 148-1, 38, could not stop, let alone explain, because, in her words, "It's Sal's company."  *Id.* at 38.  LaBarca, himself, could not justify these expenses either:  In describing his personal loans, he stated, "I needed money, so I borrowed money," and, when asked whether he "recall[ed] paying back any of those loans," LaBarca answered "No, I don't.  My accountant would know."  Doc. 141-13, 153.  His accountant, however, did not provide any information about specific loans and when asked whether the accountant was "in a position to provide us with any information about" a particular loan, the accountant answered, "No, I'm not."  Doc. 141-14, 111.

Defendants have also failed to observe corporate formalities.  As Defendants concede, "There is a dearth of evidence to demonstrate Defendant, including Defendant Labarca [sic] did regularly and consistently follow corporate formalities regarding the corporate Defendants in their dealings with the Plaintiffs and otherwise recognize and adhere to the requirements of maintaining these corporate Defendants under New York law."  Doc. 168, 23.[25]  Indeed, other than separate tax returns and a single board meeting, Defendants provide little evidence of Defendants' adherence to corporate formalities.

---

[25] The Court acknowledges that Defendants likely misspoke in the cited sentence.  The statement does, however, aptly describe the state of evidence.

Defendants have also undercapitalized SL Construction and Phase Construction. As Plaintiffs argue, "Counsel has explicitly told the Court that the companies lack the financial wherewithal to even pay discovery sanctions of $13,000." Doc. 173, 14. A company that made million-dollar loans to its sole owner, without any record of repayment, but pleads poverty in an attempt to escape a $13,000 court-imposed sanction qualifies as undercapitalized.

Finally, and most importantly, "A failure to disregard the corporate form in the circumstances of the present case would fatally undermine ERISA." *Lowen*, 829 F.2d at 1221. "Congress enacted ERISA to ensure that employees would receive the benefits they had earned . . . ." *Conkright v. Frommert*, 559 U.S. 506, 516 (2010). In 2005, the Union and SL Construction entered into a CBA that guaranteed certain employee benefits. Doc. 141-5, 24. In 2013, the Union discovered that Phase Construction had improperly denied benefits promised under that CBA, as LaBarca acknowledged in the affiliation letter. Doc. 141-26. In 2014, Plaintiffs sued SL Construction and Phase Construction to collect the improperly denied benefits. Doc. 1. In response, Defendants dragged Plaintiffs through a thicket of frivolous discovery disputes, Doc. 77, and created Phase NY, an alter ego of SL Construction and Phase Construction, Doc. 141-9. Then, at the end of 2017, after SL Construction and Phase Construction transferred millions of dollars to LaBarca and $413,500 to this newly created alter ego, Defendants' counsel represented to the Court that SL Construction and Phase Construction could not pay the court-imposed sanctions of just $13,000 because "they've been out of business." Doc. 109, 5. This shell game, if allowed to continue, would make it nearly impossible for Plaintiffs to collect the owed benefits and thus would fatally undermine ERISA's guarantees.

In response, Defendants claim that the corporate defendants "maintained their own bank accounts," "dealt separately with municipal and government entities and contractors, purchased their own insurance, had their own payroll, [and] entered separate contracts."  Doc. 168, 23.  The available evidence flatly refutes these assertions.

In practice, the corporate defendants did not treat their bank accounts as distinct.  From 2008 to 2017, the three companies transferred $3,108,936.61 between them, and of the money transferred, $2,985,080.59—fully 96% of the total—moved without any documentation.  Doc. 139-1.  Furthermore, SL Construction—not Phase Construction—maintained an American Express card, Doc. 141-13, 147–148, but Phase Construction paid SL Construction's American Express bill.  Doc. 141-55, 2.

The Corporate Defendants also did not deal separately with governmental entities.  In a 2009 application for the New York City School Construction Authority, Phase Construction portrayed itself as SL Construction and wrote that it had previously "operated under" the name "SL Construction Group, Inc."  Doc. 141-11, 3.

The Corporate Defendants do not have their own insurance.  As LaBarca affirmed in his affidavit, "I believe all corporate Defendants are insured by the State Insurance Fund under" the same policy and "I do not know of any other insurance contracts presently held by any of the corporate Defendants."  Doc. 141-12, 5.

The companies do not have their own payroll.   LaBarca testified that the office manager at SL Construction does payroll for Phase Construction.  Doc. 141-13, 42 ("Q.  What companies does the office manager at SL do the payroll for?  A.  Phase Construction.").  *See also Id.* at 44–45 ("[Y]our testimony was Ms. Silva is responsible for calling in the payroll? A.  The hours, yes

. . . Q. She does that for Phase Construction? A. Yes. Q. Does Ms. Silva also call in the hours for SL Construction? A. Yes.").

The Corporate Defendants did not always enter into their own contracts. For example, Phase Construction requested payment for work performed by SL Construction, Doc. 141-60, 2, Phase Construction received payment for an entire contract entered into by Phase NY, 141-79, 6, and Phase Construction leased a multifunction printer for Phase NY, Doc. 141-80, 18–19.

## VI.    Remedies

To remedy the wrongs described above, Plaintiffs ask the Court (a) to hold Defendants jointly and severally liable for unpaid benefits, dues check offs, MTDCPAC contributions, interest, audit costs, litigation costs, and attorney's fees; (b) to allow an audit of all Corporate Defendants within thirty days of the auditor's request; and (c) to hold Defendants jointly and severally liable for unpaid benefits, dues check offs, MTDCPAC contributions, and costs arising from that future audit.

Plaintiffs' request for unpaid benefits, litigation costs, attorney's fees, and interest is GRANTED. The Funds brought this actions under 29 U.S.C. § 1145. Doc. 81. ERISA provides:

> In any action under this subchapter by a fiduciary for or on behalf
> of a plan to enforce section 1145 of this title in which a judgment
> in favor of the plan is awarded, the court shall award the plan--
> (A) the unpaid contributions, (B) interest on the unpaid
> contributions, (C) an amount equal to the greater of--(i) interest on
> the unpaid contributions, or (ii) liquidated damages provided for
> under the plan in an amount not in excess of 20 percent (or such
> higher percentage as may be permitted under Federal or State law)
> of the amount determined by the court under subparagraph (A),
> (D) reasonable attorney's fees and costs of the action, to be paid by
> the defendant, and (E) such other legal or equitable relief as the
> court deems appropriate. For purposes of this paragraph, interest
> on unpaid contributions shall be determined by using the rate

> provided under the plan, or, if none, the rate prescribed under
> section 6621 of Title 26.

29 U.S.C. § 1132(g)(2). The Court holds, as explained above, that Phase Construction owes the unpaid benefits identified by the payroll audit. Furthermore, the Court finds SL Construction, Phase Construction, and Phase NY to be a single employer and "that finding is enough to hold them jointly and severally liable for each other's debts and obligations, including financial obligations under the collective bargaining agreement." *Lihli Fashions Corp.*, 80 F.3d at 748. The Court also holds that that it may pierce the Corporate Defendants' veil to enforce the ERISA claims. As a result, it enters judgment against Defendants to enforce 29 U.S.C. § 1145 and requires Defendants to pay the mandatory damages specified in 29 U.S.C. § 1132(g)(2)(A)–(D).

Plaintiffs' request for dues check offs and MTDCPAC contributions is GRANTED. The Union brought this suit pursuant to Section 301 of the LMRA. Doc. 81. "Section 301 authorizes suits for the violation of a contract between an employer and a labor organization representing employees in an industry affecting commerce." *Lollo*, 35 F.3d at 34. "An award of prejudgment interest in a section 301 action is within the discretion of the trial judge." *Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1161 (2d Cir. 1994). In light of the facts described above, the Court exercises this discretion. The Court holds, as explained above, that Phase Construction owes the dues check offs and MTDCPAC contributions identified by the payroll audit. Doc. 141-5, 12. The Court finds SL Construction, Phase Construction, and Phase NY to be a single employer and "that finding is enough to hold them jointly and severally liable for each other's debts and obligations, including financial obligations under the collective bargaining agreement." *Lihli Fashions Corp.*, 80 F.3d at 748. As a result, the Court enters judgment against all Corporate Defendants for dues check offs, MTDCPAC contributions, and interest.

Plaintiffs' request for the cost of its past audit is GRANTED. The CBA provides that "[i]f an audit of the Employer's book and records is required and a deficiency . . . is found which is not paid within seven days after reasonable notice, the Employer agrees to pay the cost of all audit . . . fees necessary to effect collection of the deficiency." Doc. 141-5, 17. The Court grants Plaintiffs' motion for summary judgment for benefits, dues, and contributions for the nineteen employees identified by the S&P's payroll audit. Therefore, the audit was necessary to collect the deficiency found here and the Court will award the Plaintiffs the audit's cost,

Plaintiffs' request to audit Corporate Defendants within 30 days of an auditor's request is GRANTED, barring unforeseen circumstances. The CBA provides that "records of any affiliate, subsidiary, alter ego, joint venture, successor or related company of the Employer shall also be made available at all reasonable times for inspection and audit by the accountants of the Trust Funds set forth in this Article of the Agreement." Doc. 141-5, 16. The Court finds that SL Construction, Phase Construction, and Phase NY are alter egos. Pursuant to the CBA, their records "shall also be made available at all reasonable times for inspection and audit by the accountants of the Trust Funds set forth in this Article of the Agreement." Doc. 141-5, 16.

Plaintiffs' request to hold Defendants jointly and severally liable for unpaid benefits, dues check offs, MTDCPAC contributions, and costs arising from that future audit is DENIED. "A threatened injury must be certainly impending to constitute injury in fact. *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (internal quotation marks omitted). Plaintiffs have not attempted to show that the future injury is "certainly impending." As a result, the Court denies the request.

## VII. Sanctions

Plaintiffs moved preemptively for an "an order of preclusion under Rule 37(b)(2)(A)(ii) preventing Defendants from opposing this motion with any documents responsive to Plaintiffs' discovery requests that were not previously produced." Doc. 134. In opposition to Plaintiffs' motion for summary judgment, Defendants produced only a six-page declaration signed by LaBarca. Doc. 169. Plaintiffs have not argued that this declaration was responsive to Plaintiffs' discovery requests or identified documents relied upon by Defendants that were not produced in discovery. Accordingly, this motion is DENIED as moot.

Plaintiffs also move to enter judgment in the amount of $13,194.50 for attorney's fees previously awarded to Plaintiffs as a discovery sanctions. This request is GRANTED pursuant to the opinion and order entered April 20, 2016. Doc. 98.

## VIII. Conclusion

For the reasons set forth above, Plaintiffs' motion for summary judgment is GRANTED in part, Plaintiffs' motion for preclusion is DENIED as moot, and Defendants' cross-motion for summary judgment is DENIED. The parties are directed to submit a proposed Final Judgment and Order reflecting these finding by January 29, 2019. The Clerk of the Court is respectfully directed to terminate the motions, Docs. 134, 144.

It is SO ORDERED.


Dated:      January 3, 2019
            New York, New York


                                              Edgardo Ramos, U.S.D.J